UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION


ARTHUR JONES,                            )
                                         )
        Plaintiff,                       )
                                         )
    v.                                   )      No.  1:11CV3 RWS
                                         )                   (TIA)
MICHAEL J. ASTRUE,                       )
COMMISSIONER OF SOCIAL SECURITY,         )
                                         )
        Defendant.                       )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.  The

case was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. §

636(b).  The suit involves applications for Disability Insurance Benefits under Title II of the Social

Security Act and Supplemental Security Income under Title XVI of the Act.

**I.      Procedural History**

On March 9, 2007, Claimant filed Applications for Disability Insurance Benefits under

Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 221-28)[1] and for Supplemental Security Income

payments pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et. seq. (Tr. 224-

34) alleging disability since November 2, 2003 due to back and neck problems, bipolar disorder,

and headaches.  (Tr. 117, 322).  The applications were denied (Tr. 169-72), and Claimant

subsequently requested a hearing before an Administrative Law Judge (ALJ), which was held on

September 25, 2008.  (Tr. 94-118).  In a decision dated December 11, 2008, the ALJ found that

_____
[1]"Tr." refers to the page of the administrative record filed by Defendant with its Answer.
(Docket No. 11/filed March 17, 2011).

Claimant had not been under a disability as defined by the Social Security Act. (Tr. 14-29). After considering the statement from Johnny Mott, the Appeals Council denied Claimant's Request for Review on November 12, 2010. (Tr. 1-5, 862-64). Thus, the ALJ's decision is the final decision of the Commissioner.

## II. Evidence Before the ALJ

### A. Hearing on September 25, 2008

#### 1. Claimant's Testimony

At the hearing on September 25, 2008, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 95-111). At the time of the hearing, Claimant was forty years of age and living in Poplar Bluff. (Tr. 97). Claimant's date of birth is December 16, 1967. Claimant completed high school. (Tr. 97). Claimant served in the Navy for two years, and he was discharged for a pattern of misconduct, other than honorable discharge. (Tr. 98). Claimant testified that a nervous breakdown lead to his discharge. (Tr. 98). Claimant is covered by Medicaid. (Tr. 111).

Claimant has a felony conviction for aggravated battery in Kansas. (Tr. 99). Claimant testified that as he tried to disarm the victim, he jerked the bat out of her hands, and he caught the victim in the forehead with the bat. (Tr. 99). Claimant does not have a driver's license as recommendation by a psychiatrist. (Tr. 106).

Claimant lives with Johnny Mott and does not pay any rent. (Tr. 107). Claimant testified that they both do their own grocery shopping. Claimant receives food stamps. (Tr. 107). Claimant's friends are members of his Indian tribe, the Aniyunwiya Tribe located in Grassy, Missouri. (Tr. 108). Claimant testified while attending tribal gatherings four to five times a

month, he participates in activities involving walking and observes in activities involving dancing. (Tr. 108-09). Claimant stopped hunting and seldom goes fishing. (Tr. 109). Claimant testified that his friend does almost all the household chores. (Tr. 110).

Claimant last worked in November 2003 at Blattner's Steel, a sheet metal plant, but he quit working because his back gave him too much trouble. (Tr. 99-100, 111).

Claimant testified that he cannot work because of bipolar disorder, and lower back and neck problems. (Tr. 100). Claimant experiences neck and back pain and migraines two to three times a week. Claimant rated his headaches at a level ten. (Tr. 101). Claimant experiences problems with dizziness, and he falls a couple times a month. (Tr. 102). His neck pain is in the lower part of the neck. (Tr. 100). He has been diagnosed with degenerative disc disease. (Tr. 101). Claimant has problems remembering . (Tr. 102). In 2006, Claimant's left leg went between the spacings on a dock, and he pulled his leg out. (Tr. 103). Claimant testified that the arthritis in his leg causes shooting pain. (Tr. 103). In damp weather, Claimant's leg goes out from under him. (Tr. 105). Claimant testified that he can walk thirty to forty feet, and then he becomes tired. On occasion, he experiences dizzy spells. (Tr. 106). Claimant has problems standing when his back pops out. (Tr. 106). Claimant testified that he experiences terrible pain in his lower back. (Tr. 110).

Claimant testified that he socializes with people from time to time. (Tr. 104). Claimant has been diagnosed with depression. Claimant has felt the urge to take his life and his last suicide attempt occurred in 2002 after his father died. (Tr. 104-05). Claimant has attempted to commit suicide a couple of times. (Tr. 105).

### 2. Testimony of Johnny Mott

Johnny Mott testified in response to questions posed by the ALJ and counsel. (Tr. 112-18). Mr. Mott testified that he met Claimant in 2002. (Tr. 112). At the time, Claimant was living in a tent and not taking any medications. (Tr. 113). Mr. Mott has observed Claimant sitting in a dark room crying. Mr. Mott indicated this happens three to four times a month. (Tr. 113). Mr. Mott testified that his family has adopted Claimant. Mr. Mott hears Claimant complain of pain and discomfort all the time. (Tr. 114). Mr. Mott has witnessed Claimant having a dizzy spell and noted that Claimant wants to be by himself quite often. (Tr. 115). At tribal functions, Claimant listens to others speak. (Tr. 115). Mr. Mott testified that Claimant has been given the name, Awasa Waya, Lone Wolf. (Tr. 116).

Mr. Mott testified that he does the laundry, shopping, cleaning, yard work, and cooking. (Tr. 116). Mr. Mott testified that a typical day for Claimant includes sadness, depression, not feeling well, and feeling useless. (Tr. 116).

### 3. Open Record

At the beginning of the hearing, Claimant's counsel requested the ALJ to keep the record open for thirty days so that he could submit additional records. (Tr. 96). A review of the record shows that the counsel timely submitted the additional medical records to the ALJ before he issued a decision denying Claimant's claims for benefits. (Tr. 755-861).

### 4. Forms Completed by Claimant

In the Claimant Questionnaire, Claimant reported sometimes washing the dishes and feeding the fish. (Tr. 264). Claimant reported being able to do the laundry and dishes, make the bed, vacuum and some grocery shopping. (Tr. 265). As his activities, Claimant listed watching

movies on the television, attending Native American meetings with his adopted family, playing video games for a couple of hours, and reading tribal newsletters. (Tr. 266). Claimant reported not having a driver's license due to an accident, and no one had advised him not to drive. (Tr. 266). Claimant reported being a loner and not being comfortable around crowds. (Tr. 267).

In the Function Report - Adult, Claimant listed making the bed, doing a load of laundry or dishes, and playing on the computer as some of his daily activities. (Tr. 282). Claimant feeds his fish. (Tr. 283). Claimant prepares his meals of pizza and sandwiches. (Tr. 284). Claimant listed the following as his household chores: laundry, dusting, sweeping or vacuuming, and doing the dishes and laundry. (Tr. 284). Claimant listed playing Play Station 2, fishing, hunting and using the computer as his hobbies. (Tr. 286).

In the Function Report - Adult, Claimant listed feeding his pigeon and fish and fishing as some of his daily activities. (Tr. 380). Claimant noted that Dr. McCool had instructed him not to drive. (Tr. 383). Claimant indicated that he can walk one half a mile before he needs to rest. (Tr. 385).

## III.    Medical Records

On December 5, 2003, Claimant reported having back pain and depression during a visit to Immediate Healthcare. (Tr. 93, 416, 657). Claimant reported not taking any medications. Claimant reported Zoloft working before but not taking any anti-depressants since 2001 due to inability to afford medications. The doctor prescribed Zoloft. (Tr. 93, 468, 657). In a recheck visit, Claimant reported Zoloft not working. (Tr. 92, 415, 467, 656). On January 31, 2004, Claimant requested increasing his dosage of Effexor to 75 mg. (Tr. 91, 414, 466, 655). The doctor noted Claimant to be considered an alcoholic, and his attitude poor to others. The doctor

increased his medication level. (Tr. 91). In follow-up treatment on February 1, 2004, Claimant reported neck pain and to be drying out. (Tr. 90, 413, 465, 654).

On January 22, 2004, Claimant received treatment in the emergency room for an intentional overdose of Naproxen. (Tr. 421, 532-33, 602-03). Claimant ingested a handful of Naproxen after drinking alcohol. Claimant reported being upset emotionally and not wanting to live when he overdosed on the Naproxen but at the time of examination, Claimant denied being suicidal. Examination showed Claimant to move all extremities spontaneously and symmetrically. (Tr. 421, 532-33, 602-03). A crisis counselor evaluated Claimant and found Claimant suffers from depression and anxiety and mild substance abuse but is not actively suicidal. (Tr. 422, 534).

On February 6, 2004, Claimant requested a medication refill of Librium in the emergency room at Southeast Missouri Hospital. (Tr. 419, 530, 600). The emergency room doctor diagnosed Claimant with nervousness and need for medication refill. Claimant reported that he recently received Medicaid coverage. (Tr. 420, 601). The doctor prescribed Librium 10 mg for anxiety. (Tr. 420, 601).

In the emergency room note of February 14, 2004, Claimant reported a history of alcoholism and recent cessation of consumption in the last two weeks. (Tr. 417, 598). Claimant reported problems with depression and out of medications. Claimant reported receiving counseling from Chief White Eagle. Claimant has difficulty sleeping. Dr. Ronald Robinson, the treating doctor at Southeast Missouri Hospital, found Claimant not to be acutely suicidal but an alcoholic at risk for relapse. Claimant had been taking Librium to help with the initial withdrawal. Dr. Robinson prescribed a reduced dosage of Librium 10 mg as needed for sleep and when he runs out of Librium, Dr. Robinson suggested taking Benadryl. Dr. Robinson suggested Claimant

go to Community Counseling Center for counseling and follow up with Dr. Jackson and suggested Claimant look for a job to improve his self worth. (Tr. 417, 598). Dr. Robinson diagnosed Claimant with insomnia, alcoholism, and depression. (Tr. 417-18, 598-99).

Claimant received treatment in the Southeast Missouri Hospital's emergency room on March 7, 2004. (Tr. 526, 596). Claimant reported low back pain intermittently for a month but then noted has had back problems since 1996 after being in an industrial accident. Claimant reported not being treated for back pain. Dr. David Meese observed Claimant to have a normal gait. A review of the lumbosacral x-ray showed normal results. Dr. Meece prescribed outpatient physical therapy for probable recurrent lumbosacral strain. Dr. Meese noted no radicular signs to suggest disk disease. (Tr. 526, 596). The x-ray of Claimant's lumbar spine showed lumbosacral spine within normal limits. (Tr. 528, 594). The x-ray of March 7, 2004 showed lumbosacral spine within normal limits. (Tr. 771-72).

On March 26, 2004, Dr. Robert McCool completed a psychiatric evaluation. (Tr. 489, 676). Claimant reported being diagnosed with depression years ago. Dr. McCool noted Claimant to have a longstanding history of alcohol abuse. (Tr. 489, 676). Claimant reported holding multiple jobs and holding the longest job for two years. (Tr. 490, 677). Claimant reported chronic back pain limiting his physical activity. Dr. McCool included major depression, recurrent vs. bipolar II disorder, alcohol abuse, and chronic neck and back pain in his diagnostic impression. (Tr. 491, 678). Dr. McCool started Claimant on Neurontin 100 mg and increased his Effexor dosage. (Tr. 491, 678).

Claimant called Dr. McCool's office on April 2 and13, 2004 and reported that he dropped his Neurontin in the sink and requested a refill of the medication. (Tr. 716-17). Dr. McCool

authorized weekly refills.  (Tr. 717).

In an office visit on April 14, 2004, Claimant reported having a relapse and consuming a fifth of whiskey and digested four Neurontins.  (Tr. 714-15).  Mr. Mott reported that Claimant stated he wanted to die.  (Tr. 715).  On April 20, 2004, Claimant reported his mood/affect to be improved and tolerating the increased dosage of Neurontin.  (Tr. 713).

In a letter dated May 4, 2004, Kerri Doyal, a nurse at Community Counseling Center, noted how Dr. Robert McCool started seeing Claimant on March 26, 2004 and made the diagnosis of bipolar affective disorder, type II. (Tr. 462).  Nurse Doyal listed Neurontin 300 mg in the morning and 600 mg in the evening and Effexor 75 mg as Claimant's current medications. (Tr. 462).  Dr. McCool noted that Claimant had a relapse.  (Tr. 712).  Claimant reported that the Effexor medication was keeping him awake and requested an increased dosage of Neurontin.  On May 10, 2004, Claimant reported feeling good on the increased Neurontin dosage.  (Tr. 712).

On May 14, 2004, Claimant returned to Immediate Healthcare and reported injuring his foot on a fishing trip ten days earlier.  (Tr. 89, 463, 652).  The doctor prescribed medications and referred Claimant to podiatrist.  (Tr. 89, 463, 652).

On May 19, 2004, Dr. McCool authorized a thirty-day supply of Neurontin noting that Claimant's friend was dispensing his medications.  (Tr. 711).

In the June 4, 2004, Cross Trails Medical Center patient assessment sheet, a doctor assessed Claimant's back pain.  (Tr. 479, 584).  Examination showed no apparent decrease in the range of motion in his neck and no noted abnormality in gait observed.  The doctor diagnosed Claimant with lower chronic back and cervical pain, ordered an x-ray, and prescribed Celebrex. (Tr. 479, 584).

On June 11, 2004, Claimant reported one minor relapse of ethanol in the past month. (Tr. 710). Dr. McCool refilled his Neurontin prescription. (Tr. 710).

The June 11, 2004 x-ray examination of Claimant's cervical spine showed mild reversal of curvature in the upper cervical spine and lumbosacral spine within normal limits. (Tr. 72, 475, 570, 632).

On June 28, 2004, Claimant called Dr. McCool's office and admitted being out of Neurontin. (Tr. 709). Dr. McCool agreed to give weekly refills and reminded Claimant that medications needed to be kept away from him. (Tr. 709).

In the office visit on August 5, 2004, Claimant reported mood being stable after discontinuing the Effexor medication. (Tr. 707).

On September 2, 2004, Claimant reported being by upset with his probation officer regarding his drivers license. (Tr. 706). Dr. McCool apprised Claimant that he did not think Claimant to be stable enough to have a drivers license. Dr. McCool noted that Claimant has had several ethanol relapses. Dr. McCool prescribed Neurontin. (Tr. 706).

On September 14, 2004, Claimant was admitted to Southeast Missouri Mental Health Center under a 96-hour course order from Cape County Jail. (Tr. 537). Claimant was admitted after threatening to kill his probation officer and then threatening to kill himself. Claimant reported having several relapses with alcohol since 2004 and had been drinking whiskey prior to the admission. Earlier in the day, he had an argument with a friend's 78-year-old mother and hit her. Claimant reported monthly appointments with Dr. McCool at the Community Counseling Center since February 2004. (Tr. 537). Claimant receives Medicaid and outpatient mental health services. (Tr. 538). Claimant reported having a work-related back injury which had been treated

effectively with Neurontin.  Examination showed some superficial ankle abrasions from fishing.

The mental examination showed Claimant's memory and concentration to be intact and his insight

and judgment to be fair.  The treating doctor prescribed Librium to prevent any withdrawal

symptoms.  (Tr. 538).  Claimant's condition on discharge was noted to be psychiatrically stable.

(Tr. 539).  The doctor assessed his GAF to be 70 and diagnosed Claimant with alcohol abuse,

antisocial personality disorder, unemployed, and substance abuse.  (Tr. 539).

In a follow-up visit on September 21, 2004, Claimant reported he was considering looking

for possible employment and school.  (Tr. 705).  Dr. McCool suggested Voc Rehab.  (Tr. 705).

On October 14, 2004, Claimant received a Neurontin refill after taking extra Neurontin on

Saturday.  (Tr. 704).

In the October 18, 2004 progress note, Dr. McCool noted that Claimant had a relapse last

week after having an argument with a friend's mother.  (Tr. 703).  Dr. McCool increased

Claimant's Neurontin dosage.  (Tr. 703).

In the CPRC discharge note of October 31, 2004, the counselor noted Claimant was

referred for services, because he was on unsupervised probation and having trouble with his

probation officer.  (Tr. 855).  The counselor noted Claimant's prognosis to be good.  (Tr. 855).

In the November 9, 2004 Community Counseling Center Physician Progress Note, a nurse

noted the Johnny Mott called reporting Claimant having finished his 30-day prescription of

Neurontin in twelve days.  (Tr. 493, 702).  Dr. McCool authorized a refill but instructed Claimant

that the medication would be discontinued if further noncompliance.  (Tr. 493, 702).

The November 29, 2004 MRI of Claimant's cervical spine showed evidence of

degenerative changes in the disc and modest right posteorlateral disc bulge at C4-5 and mildly

narrows the nerve root axilla and a lesser disc bulge with a left posteorlateral prominence at C5-6 which causes no significant narrowing.  (Tr. 70-71, 85-86, 568-69, 632-33, 647-48).

On December 1, 2004, Claimant returned to Cross Trails Medical Center complaining of neck pain.  (Tr. 579).

On December 1, 2004, Ronnie Phillips, a targeted case manager at Community Counseling Center, completed a CPRC Rehabilitation Initial Assessment.  (Tr. 731).  Claimant reported that he helps maintain the home by cleaning, vacuuming, preparing the meals, doing the dishes, and installing molding.  (Tr. 733, 735).  Claimant reported having all the skills necessary should he "ever be able to keep a job."  (Tr. 733).  Claimant enjoys fishing two to three times a week, computer games and hunting.  (Tr. 733, 735).

On December 3, 2004, Claimant returned to Immediate Healthcare and requested a refill for Neurontin and Midrin and requested a Librium prescription.  (Tr. 88, 651).  The doctor noted Claimant to have a history of depression, ethanol abuse, and back pain and prescribed Midrin, Neurontin, and Librium.  (Tr. 88, 651).  Claimant returned on December 7, 2004, complaining that generic Librium not strong enough and having trouble sleeping. (Tr. 87, 650).  The doctor noted Claimant to still be trying to quit ethanol and prescribed Valium.  (Tr. 87).

In a follow-up visit at Cross Trails Medical Center on January 3, 2005, Claimant reported a decrease in his neck pain since his last visit and feeling better.  (Tr. 578).

On February 2, 2005, Claimant returned to Cross Trails Medical Center for treatment of his neck pain.  (Tr. 577).

In the Psychiatric Review Technique dated February 3, 2005, Dr. Holly Weems diagnosed Claimant with an affective disorder, bipolar II disorder, a personality disorder, and substance

(alcohol) addiction disorders. (Tr. 546-55). Dr. Weems found Claimant's functional limitations to be mild in restrictions of activities of daily living and difficulties in maintaining concentration and moderate in difficulties in maintaining social functioning. (Tr. 556). Dr. Weems noted how Claimant reported to field officer interviewed that he spends his days doing chores, using the computer, fixing simple meals, and watching television. (Tr. 558).

In the Mental Residual Functional Capacity Assessment, Dr. Weems found Claimant to be moderately limited in his ability to work in coordination with others without being distracted by them and his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 560-61). With respect to social interaction, Dr. Weems found Claimant to be moderately limited in his ability to accept instructions, ability to get along with coworkers, and ability to maintain socially appropriate behavior. (Tr. 561). With adaption, Dr. Weems found Claimant to be moderately limited in his ability to respond appropriately to changes in the work setting. In the remarks, Dr. Weems noted that the documents evidence mental MDI with significant substance abuse, functional limitations (notably in social domain) and both psychiatric and substance abuse treatment. Dr. Weems opined that Claimant is capable of performing at least one to two step tasks away from the general public given consistent treatment and sustained sobriety. Dr. Weems found Claimant to be partially credible. (Tr. 561).

Claimant returned for treatment at Immediate Healthcare on February 13, 2005 and requested a pain medication. (Tr. 84, 649). Examination showed tenderness in his neck, and the doctor prescribed Flexeril and Lortab. (Tr. 84).

On February 28, 2005, Claimant contacted Dr. McCool's office to apprise the doctor of

his inability to keep his appointment scheduled on March 1, 2005 due to his incarceration for thirty days. (Tr. 699). Dr. McCool refilled his Neurontin prescription. (Tr. 699). In the March 1, 2005 progress note, Claimant reported not drinking since the December incident and having anxiety about upcoming trial. Dr. McCool prescribed Neurontin as treatment. (Tr. 699).

On March 5, 2005, Claimant reported neck pain starting that morning, and the doctor at Immediate Healthcare prescribed medications as treatment. (Tr. 83, 646).

On February 25 and April 11, 2005, Claimant reported back pain at Cross Trails Medical Center. (Tr. 575-76).

On April 11, 2005, Dr. McCool noted Claimant's mood/affect to be stable and prescribed Neurontin. (Tr. 698).

On April 18, 2005, Claimant received treatment in the emergency room at Saint Francis Medical Center for neck pain. (Tr. 660-62). Claimant reported having bulging discs but not requiring surgery. (Tr. 662).

After receiving a call from Claimant regarding his ability to take medications twice a day, Dr. McCool contacted the prison nurse and explained the need to increase his Neurontin dosage. (Tr. 697). On June 15, 2005, Claimant returned to Dr. McCool's office for follow-up treatment. (Tr. 696). Dr. McCool attempted to have Claimant focus on his release date and refilled his Neurontin prescription. (Tr. 696-95).

In the August 2, 2005 progress note, Claimant reported difficulty sleeping and increased anger. (Tr. 694). Dr. McCool adjusted Claimant's Neurontin dosage. (Tr. 694). On August 31, 2005, Johnny Mott stopped by office and reported Claimant having mood swings. After consulting with Dr. McCool, the nurse contacted the county jail to let the jail know that Dr.

McCool had increased Claimant's daily dosage of Neurontin. (Tr. 693). After being released from county jail, Claimant had a follow-up visit with Dr. McCool on September 27, 2005. (Tr. 692). Claimant reported problems sleeping well. Dr. McCool noted that Claimant was scheduled to receive treatment at pain management. Dr. McCool adjusted Claimant's medication regime. (Tr. 692).

On September 28, 2005, Claimant reported low back pain of long standing duration and neck pain during his visit to the Pain Clinic at Southeast Missouri Hospital. (Tr. 610). The MRI showed a bulging disk. Dr. Richard Moore diagnosed Claimant with cervical radiculopathy secondary to bulging disc and prescribed Norco and Ultracet as treatment. (Tr. 610).

The October 1, 2005 MRI showed straightening of Claimant's cervical spine with loss of normal cervical lordosis , no spondylolisthesis, and no acute fracture or compression. (Tr. 592-93). The MRI also showed multilevel discogenic disease of the cervical spine of mild to moderate severity, most evident from C4 through C6 with associated bilateral neuroforaminal narrowing and underlying spinal canal stenosis. (Tr. 593). The x-ray of Claimant's spine showed straightening of his cervical spine with loss of normal cervical lordosis, no spondylisthesis identified, and no acute fracture seen. (Tr. 773-74). The x-ray further showed multilevel discogenic disease of mild to moderate severity, most evident from C4 through C5 with associated bilateral neuroforaminal narrowing and underlying spinal canal stenosis. (Tr. 775).

On October 11, 2005, Claimant received treatment in the emergency room at Saint Francis Medical Center for an injury to his left knee. (Tr. 665).

In a follow-up visit on October 15, 2005, Claimant reported how he was looking for employment and not consuming any alcohol. (Tr. 691). Claimant denied any recent episodes of

anger.  Dr. McCool continued Claimant's medication regime.  (Tr. 691).

Claimant returned to Immediate Healthcare on October 18, 2005, complaining of neck pain and requesting referral to pain management center for steroid injection.  (Tr. 82, 645). Examination showed stiffness, decreased range of motion, and tenderness to palpation.  The doctor prescribed Lortab and to follow up as scheduled for pain management.  (Tr. 82, 645).

In the Pain Clinic noted of October 27, 2005, Dr. Moore noted that Claimant's MRI of his cervical spine showed the spine to be essentially normal.  (Tr. 609).  Dr. Moore diagnosed Claimant with cervical myofasciitis and splenius capitus syndrome and treated Claimant with trigger point injections and prescribed Medrol Dosepak, Norco, and Zanaflex.  (Tr. 609).  In the follow-up visit on November 8, 2005, Dr. Moore noted good results after trigger point injections. (Tr. 607).

On November 29, 2005, Claimant reported nervousness and anxiety and grieving the loss of family.  (Tr. 81, 644).  The doctor at Immediate Healthcare continued Claimant's Neurontin and Prilosec prescriptions and added Abilify to his medication regime.  (Tr. 81, 644).  Claimant returned on December 1, 2005, complaining that he could not tolerate Abilify because of nausea, blurred vision, and depression.  (Tr. 80, 643).  The doctor discontinued Abilify and prescribed another medication.  (Tr. 80, 643).  On December 7, 2005, Claimant reported excruciating neck pain, and new medication making him edgy and upset.  (Tr. 79, 642).  The doctor prescribed Xanax and Ultracet.  (Tr. 79, 642).  Claimant returned on December 15, 2005, requesting a Xanax refill, smelling of alcohol and admitting to drinking liquor.  (Tr. 78, 641).  Claimant reported feeling relief on Xanax and the doctor continued the Xanax prescription.  (Tr. 78, 641).

On December 12, 2005, Claimant received medical treatment in the emergency room at

Saint Francis Medical Center for chronic back and neck pain. (Tr. 668-71). Claimant requested a referral to pain management. (Tr. 672).

In the December 14, 2005 Community Counseling Center Progress Note, Dr. McCool reviewed Claimant's treatment plan. (Tr. 700).

In the CRPC Rehabilitation Annual Assessment dated December 19, 2005, Ronnie Phillips evaluated Claimant. (Tr. 725). Claimant reported being treated at Southeast Missouri Hospital where he receives steroid shots for his back and neck pain. (Tr. 726). Claimant noted that the shots helps alleviate the pain. (Tr. 726). Claimant assists with the grocery shopping and enjoys meal preparation. (Tr. 727). In lieu of paying rent, Claimant does the dusting, vacuuming, washing the dishes and laundry, and cooking. Claimant's leisure activities include hunting, playing computer games, and going to the Pow Wows. (Tr. 727). When discussing his work history, Claimant indicated that there usually was some kind of conflict or disagreement with his employer. (Tr. 728). Claimant reported enjoying hunting and fishing and joining a fishing club on the internet. (Tr. 728). When discussing his medical treatment, Claimant acknowledged that "his medications are working well for him." (Tr. 729). Claimant reported that he benefits by being able to discuss his problems with a targeted case manager at Community Counseling Center. (Tr. 730).

In the Pain Clinic Note of December 20, 2005, Dr. Moore noted that Claimant missed his appointment a week earlier due to the flu. (Tr. 606). Claimant reported cervical pain. Dr. Moore diagnosed him with cervical myofasciitis and left and right splenius capitus myofascial syndrome and prescribed Norco, Ultracet, and Zanaflex as treatment. (Tr. 606).

On December 21, 2005, Claimant reported how his mood had been fairly stable and how

he had been receiving steroid injections to control his pain. (Tr. 690). Claimant admitted to drinking some alcohol. Dr. McCool adjusted Claimant's medications by increasing his Neurontin dosage. (Tr. 690).

On January 13, 2006, in a follow-up visit at Immediate Healthcare, Claimant requested a Xanax refill and being more relaxed and less anxious on Xanax. (Tr. 76, 639). On February 1, 2006, Claimant requested increasing his dosage of Xanax, and the doctor increased his dosage. (Tr. 75, 638).

On January 31, 2006, Claimant called Dr. McCool's office requesting a refill for his Neurontin prescription three weeks early claiming that he dropped his medicine in the sink. After consulting with Dr. McCool, the nurse called in a refill for Claimant. (Tr. 689).

On February 6, 2006, Claimant returned to Immediate Healthcare for a refill of Neurontin and requested an increase in the dosage. (Tr. 74, 637). Claimant reported having chronic neck pain. (Tr. 74, 637). In a follow-up visit on February 17, 2006, Claimant indicated that he would like his Neurontin dosage increased so that he could get more results. The doctor noted Claimant to be on the maximum dosage and Claimant did okay on Effexor. (Tr. 73, 636). Claimant returned for medication refills on February 27, 2006 and reported some improvement with his depression on the medications. The doctor continued Claimant's Xanax and Neurontin medications. (Tr. 69, 629).

Dr. McCool's Progress Note of February 27, 2006 notes that Claimant failed to keep a scheduled appointment. (Tr. 689).

In the March 21, 2006 progress note, Claimant reported seeing a physician at Immediate Healthcare and being prescribed medications, Neurontin and Xanax. (Tr. 689). Claimant noted

that the doctor did not support his taking Xanax due to his ethanol abuse. Claimant claimed the Xanax reduced his anxiety. Claimant reported being unable to work because of his pain and upset by social services placing him in that direction. (Tr. 689).

In a follow-up visit on March 28, 2006, Claimant returned for Xanax and Neurontin refills and reported not being suicidal. (Tr. 68, 628). Claimant also reported discontinuing the Effexor medication on his own. (Tr. 68, 628). Claimant returned for refills on May 3, 2006 and reported his depression not to be worse off Effexor. (Tr. 67, 627).

In the office visit on May 16, 2006, Claimant reported starting a job selling vacuum cleaners and worried about the social anxiety from being around people. (Tr. 688). Claimant consumed four drinks in the last week. Dr. McCool diagnosed Claimant with bipolar II and ethanol abuse and continued his medication regime. (Tr. 687-88).

On June 3, 2006, Claimant returned to Immediate Healthcare for medication refills and reported doing okay on medications. (Tr. 65, 625).

Dr. McCool's Progress Note of June 13, 2006 notes that Claimant failed to keep a scheduled appointment. (Tr. 686). On June 20, 2006, Claimant reported having an episode and intermittent drinking but no thoughts of suicide. Claimant reported Neurontin being helpful. Dr. McCool refilled his Neurontin prescription. (Tr. 686). In a follow-up visit on July 20, 2006, Claimant reported the increased dosage of Neurontin had been helpful reducing his anxiety and denied any alcohol consumption. (Tr. 685). Dr. McCool refilled his Neurontin prescription. (Tr. 685).

On June 23, 2006, Claimant reported back pain at Cross Trails Medical Center. (Tr. 575).

On July 29, 2006, Claimant returned to Immediate Healthcare for a Xanax refill and the

doctor noted that Claimant's mood and affect appeared to be well, and his thought process to be logical. (Tr. 64, 624). Claimant reported no suicidal or homicidal thoughts. (Tr. 64). In a follow-up visit on August 2, 2006, Claimant reported chronic neck and low back pain and has been treated by pain specialists. (Tr. 63, 623). Examination showed tender lower lumbar. The doctor made a referral to a back specialist. (Tr. 63).

On August 17, 2006, Claimant reported not sleeping well and not being motivated to do things. (Tr. 684). Claimant admitted to ethanol consumption, but he denied any binge drinking. Dr. McCool advised Claimant not to consume any alcohol and refilled his Neurontin medication. (Tr. 684).

On August 27, 2006, Claimant returned to Immediate Healthcare requesting medication refills even though his medications had been refilled on August 17, 2006. (Tr. 62, 622). Claimant explained that his medications fell down the sink. Examination showed mild tenderness to palpation. The doctor refilled the medications and ordered a lower spine x-ray. (Tr. 62, 622).

On August 30, 2006, Claimant received treatment for his lower spine at Immediate Healthcare. (Tr. 61, 621). Claimant reported chronic back pain, and the doctor recommended pain management. (Tr. 61, 621).

On September 7, 2006, Claimant received treatment in the emergency room at Southeast Missouri Hospital for a laceration of his left knee caused by falling into a hole. (Tr. 53, 595, 612). Claimant went to Immediate Healthcare for medications as instructed by emergency room doctor. (Tr. 60). The doctor treated the laceration area and prescribed medications. (Tr. 60).

On September 11, 2006, Claimant called Dr. McCool's office reporting to be out of Neurontin, because his medication fell out of his pocket into a lake. (Tr. 683). After consulting

with Dr. McCool, the nurse called in a refill in the amount of twenty-eight tablets. (Tr. 683). In a follow-up visit on September 18, 2006, Claimant reported his sleep had improved, and his mood/affect to be stable. Claimant reported a recent accident on a dock where he lacerated his leg, and he received multiple sutures. (Tr. 683).

On September 15, 2006, the doctor noted Claimant's lacerations to be healing well. (Tr. 58, 618). On September 22, 2006, Claimant reported a burning sensation in his left ankle when walking or standing and requested a referral for pain medication. (Tr. 57, 617). On September 29, 2006, Claimant reported left ankle pain and burning sensation since the injury and requested pain management referral. (Tr. 55, 614). The doctor noted that the wound is much better and healing well. (Tr. 55).

On October 2, 2006, Mr. Mott called Dr. McCool's office to let the doctor know that Claimant has a staph infections from his leg injury, and Claimant had been taking extra Neurontin and expressing a desire to drink to alleviate his discomfort. (Tr. 682). Mr. Mott requested pain medication for Claimant. Dr. McCool directed Claimant to contact his family physician. (Tr. 682).

In follow-up treatment on October 2, 2006, Claimant reported increased swelling and recurrent seroma. (Tr. 54, 613). The doctor noted that pain management would not accept Claimant. (Tr. 54).

On October 18, 2006, Claimant called Dr. McCool's office wanting to know if the doctor had increased his Neurontin dosage. (Tr. 682). Claimant admitted taking more Neurontin than ordered. The nurse strongly urged Claimant to take Neurontin as prescribed and noted that Claimant did not indicate that he would. (Tr. 682).

After calling and requesting a Neurontin refill on November 13, 2006, Dr. McCool authorized a refill of twenty tablets. (Tr. 682). In a follow-up visit on November 20, 2006, Claimant reported limited activities and some episodic ethanol usage. (Tr. 681). Dr. McCool encouraged Claimant to increase his activity and look for structured activities. (Tr. 681).

In the CRPC Rehabilitation Annual Assessment dated December 11, 2006, David Bertrand evaluated Claimant. (Tr. 719). Mr. Bertrand noted that Claimant had been in a recent boating accident and had to have surgical repair of his right knee. Claimant reported neck and back pain, both treated by Dr. Moore at Southeast Missouri Hospital in the Pain Management Group. (Tr. 719). As treatment, Claimant received steroid shots, and Claimant reported this treatment helps. (Tr. 720). Claimant receives Medicaid and food stamps. Claimant reported not needing any assistance in preparing proper nutritional meals for himself and his roommate. Claimant reported enjoying shopping except he does not like crowds. Claimant reported keeping a neat and orderly trailer by trying to keep up with the dishes, laundry, and cooking. Inasmuch as he does not contribute money, Claimant indicated that he has to do some of these things to help out. (Tr. 720). Mr. Bertrand noted that although Claimant reported having difficulty taking showers and shaving when he is depressed, Claimant did a very good job maintaining his own personal hygiene. (Tr. 720). Claimant indicated that he looks forward to attending community events to provide story telling. (Tr. 721). For leisure, Claimant reported enjoying hunting, fishing, mastering computer games on the Play Station, attending Pow-Wows with his tribe, and playing board games. Claimant reported playing games on average four hours a day. Claimant reported problems with his drinking around the holidays. (Tr. 721). Mr. Bertrand listed in Claimant's diagnostic formulation the following: bipolar disorder, alcohol abuse, chronic neck

pain, problems with social network - moderate, occupational problems - severe, problems with daily living skills - moderate and assessed his GAF to be 57. (Tr. 722). Dr. McCool completed the Physician Consultation and found Claimant to meet the criteria for Community Psychiatric Rehabilitation Program and Targeted Case Management Services. (Tr. 723-24).

On January 22, 2007, Claimant reported improvement in his mood since starting Naloxane but he still is drinking every three to four days. (Tr. 680). Dr. McCool advised Claimant to contact Gibson Center for ethanol treatment. Claimant reported that he is no longer taking Xanax prescribed by the doctor at Immediate Healthcare. (Tr. 680).

In an office visit on February 20, 2007, Claimant reported his mood/affect to be stable although he has been drinking twice a week six to eight drinks at a time. (Tr. 679). Claimant indicated that he is motivated to seek treatment. Dr. McCool increased Claimant's Neurontin dosage. (Tr. 679).

In the Mental Residual Functional Capacity Assessment dated April 19, 2007, J. Spence, a medical consultant, found Claimant to be moderately limited in his ability to work in coordination with others without being distracted by them and his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 739-40). With respect to social interaction, the consultant found Claimant to be moderately limited in his ability to interact with the general public, to accept instructions, and ability to get along with coworkers. (Tr. 740). With adaption, the consultant found Claimant to be moderately limited in his ability to respond appropriately to changes in the work setting. (Tr. 740). In the remarks, the consultant noted that in February 2006 Claimant reported that he cannot work due to his physical

impairments. (Tr. 741). In May 2006, Claimant started a job as a vacuum cleaner salesman. Since that time, Claimant has admitted continued ethanol abuse. Most recent medical notes show Claimant's mood/affect to be stable, and he has no overt hypomanic or psychotic symptoms. The consultant opined that "[w]hile claimant does have an MDI, the file supports that he is capable of performing simple, repetitive tasks on a sustained basis. He would perform best away from the public given his history of assault." (Tr. 741).

In the Psychiatric Review Technique dated April 19, 2007, J. Spence, a PhD, found Claimant to have bipolar II disorder, antisocial personality disorder, and ethanol abuse. (Tr. 742-48). With respect to functional limitations, Dr. Spence determined Claimant to have a moderate limitation in activities of daily living and difficulties in social functioning and a mild limitation in maintaining concentration, persistence, or pace. (Tr. 750).

In the Physical Residual Functional Capacity Assessment completed on April 17, 2007, L. Spratt, a medical consultant, listed Claimant's primary diagnosis to be DDD c-spine C4-C6. (Tr. 142). The consultant indicated that Claimant can occasionally lift fifty pounds, frequently lift twenty five pounds, and stand and walk about six hours in an eight-hour workday. (Tr. 143). The consultant noted that Claimant can sit about six hours in an eight-hour workday and has unlimited capacity, other than shown for lift and/or carry, to push and/or pull. As the evidence in support, the consultant noted how Claimant's most recent MRI of c-spine dated October 2005 showed Claimant to have mild to moderate severity of multilevel DDD of the c-spine and his neck pain causing migraines. (Tr. 143). Further, the consultant noted that the "FMD noted dated 1/07 don't report any clinical physical problems." (Tr. 144). The consultant indicated that Claimant has no established postural, visual, communicative, or environmental limitations. (Tr. 145-46).

The consultant found Claimant to have limited reaching in all directions as a manipulative limitation and noted that Claimant should limit overhead lifting bilaterally due to mild-moderate degenerative disc disease of the cervical spine. (Tr. 145).

In analyzing the severity of Claimant's symptoms and the alleged effect on function and whether such is consistent with the evidence, the consultant noted as follows:

> On CQ, claimant reports he washes dishes sometimes, vacuums, and loads the dishwasher. He has problems sometimes due to depression or neck pain and dizziness. He goes fishing with his friend/care-giver. He plays video games a lot during the day. He has trouble with lifting, squatting, bending, standing, reaching, kneeling, and climbing stairs. He can walk ½ mile to 1 mile before he must rest.
>
> The claimant has Medicaid, and while he has sought extensive psych treatment, he has not received much physical treatment for alleged neck/back pain and headaches since 12/05. The DO didn't note any limitations related to c/o neck or back pain, or headaches. Therefore, evidence supports the above restrictions are reasonable. Claimant's statements are considered partially credible.

(Tr. 147).

The April 26, 2007 MRI of Claimant's brain showed focal area of hypodensity is seen causing some widening of the cortical sulci of the left parietal area near the coronal vertex most probably due to old trauma or focal ischemic change. (Tr. 753, 782). The rest of the examination was normal. (Tr. 753, 782).

In an office visit on May 14, 2007, Claimant reported experiencing headaches. (Tr. 861).

In a telephone call on June 25, 2007, Mr. Mott reported Claimant stopped taking Neurontin his headaches stopped but his depression returned. (Tr. 860). Dr. McCool treated Claimant on June 28, 2007. Claimant reported having frequent, intense headaches. Claimant stopped taking Neurontin ten days earlier. Claimant cancelled his follow-up appointment on July 10, 2007. (Tr. 860).

During a follow-up visit, Claimant reported his mood to be fairly stable. (Tr. 859). Dr. McCool authorized a referral to a neurologist. (Tr. 859). On July 26, 2007, Claimant reported his mood/affect to be stable during an office visit to Dr. McCool. (Tr. 858).

On August 2, 2007, Claimant reported neck and back pain to Mark Hahn at the Plaza Primary Care of Southeast Missouri Hospital. (Tr. 766). Claimant reported being a smoker of twenty years. Claimant reported a history of migraine headaches. Claimant reported having been treated in a pain clinic, but he has not returned for treatment in over two years. Claimant reported not having a steroid injection for a few years. Examination showed some generalized tenderness to palpation over the paraspinal musculature from the cervical spine to the lumbar spine with the tenderness most noticeable over the right cervical spine and lumbosacral region. (Tr. 766). Dr. Hahn noted that Claimant's range of motion to be fairly well preserved. (Tr. 766-67). Dr. Hahn noted that he would recheck Claimant's x-rays inasmuch as two to three years had passed since any imaging had been done. (Tr. 767). Dr. Hahn directed Claimant to start taking MOTRIN tablets to address anti-inflammatory properties and help with chronic pain and headaches. Dr. Hahn also discussed proper diet and exercise noting that exercise would help out the back arthritis. (Tr. 767). The x-ray of Claimant's cervical spine showed degenerative changes of the cervical spine, but no evidence of acute traumatic abnormality. (Tr. 768). The x-ray of Claimant's thoracic spine showed minimal scoliosis and no evidence of acute traumatic abnormality. (Tr. 769). The x-ray of Claimant's lumbar spine showed lumbosacral spine within normal limits. (Tr. 770).

On August 2, 2007, Mr. Mott called Dr. McCool's office and reported how Claimant had been drinking heavily since stopping Neurontin and called back on August 6, 2007 and reported

Claimant was no longer drinking heavily. (Tr. 857). In an office visit on August 27, 2007, Claimant reported mood has been down, and he has been anxious. (Tr. 857).

In the September 24, 2007 Community Counseling Center treatment note, a nurse from Dr. McCool's office noted how Claimant would be moving to Poplar Bluff and called in a 90-day prescription for Neurontin. (Tr. 856).

On November 5, 2007, Dr. Shahid Choudhary, a neurologist, evaluated Claimant on referral by Dr. Edith Hickey. (Tr. 780). Claimant reported having headaches twice a week and lasting the whole day for the last nine to ten months and rated his headaches at a level ten. Claimant reported being treated with various medications but not achieving any relief. Claimant indicated that Relpax helped him the most. Claimant reported a family history of migraine headaches. (Tr. 780). Dr. Choudhary observed Claimant's gait to be normal and noted full extremity strength. (Tr. 781). Dr. Choudhary opined that Claimant most likely has migraine headaches, however, there may also be a component of tension type of headaches. Dr. Choudhary prescribed Relpax noting that Claimant reported Relpax to be helping. Dr. Choudhary also prescribed Elavil at bedtime inasmuch as Claimant still experienced more headaches. Dr. Choudhary noted that because stress and anxiety might be contributing factors, Claimant would follow-up with his psychiatrist for optimal treatment. (Tr. 781). On November 7, 20007, Claimant called Dr. Choudhary's office requesting an Ultracet prescription and noting that Elavil had not helped. (Tr. 779). Dr. Choudhary indicated that he does not prescribe Ultracet for chronic headaches but offered to refer Claimant to a headache clinic. Claimant declined the referral noting that he needed time to set up transportation inasmuch as he just moved to the area. (Tr. 779).

Claimant received treatment in the emergency room at Poplar Bluff Regional Medical Center on January 27, 2008 for dizziness. (Tr. 796, 802). In the assessment, the treating doctor found Claimant able to ambulate independently and to perform all activities of daily living without assistance. (Tr. 801). Claimant rated his neck pain at a level four. At the time of discharge, Claimant reported improvement in his pain. (Tr. 801). Examination of his spine showed no tenderness. (Tr. 803).

In the Psychiatric Evaluation of February 4, 2008, Dr. Talia Haiderzad, a psychiatrist at the Family Counseling Center, evaluated Claimant on referral from Dr. McCool's office after moving into the Poplar Bluff area. (Tr. 760). Claimant reported taking two Ambien tablets after not being able to sleep for twenty-fours on December 11, 2007. Mr. Mott called the paramedics thinking Claimant had overdosed on sleeping pills. After bumping into the paramedic, the paramedic pushed Claimant who attacked the paramedic by punching him in the temporal. Claimant has a court date on January 31, 2008. Claimant reported bouts of depression. (Tr. 761). Claimant reported smoking a half a package of cigarettes each day. (Tr. 762). Claimant spends his day watching television and playing games on Play Station. (Tr. 762). Dr. Haiderzad observed Claimant's gait to be normal, and his attention and concentration overall to be fair. (Tr. 763). Dr. Haiderzad diagnosed Claimant with major depressive disorder, alcohol abuse, antisocial personality disorder, unemployment, and legal issues. Claimant agreed to a trial of Zoloft as treatment, and Claimant agreed noting that Zoloft has helped him before. (Tr. 762). Dr. Haiderzad also prescribed Klonopin for anxiety and referred Claimant for treatment by a chemical dependency counselor. (Tr. 764).

On February 14, 2008, Claimant received treatment in the emergency room at Poplar Bluff

Regional Medical Center.  (Tr. 807-11).

On February 20, 2008, Claimant called Dr. Haiderzad's office requesting his Klonopin dosage be increased.  (Tr. 758).  After discussing his medication regime, Dr. Haiderzad prescribed Lunnesta for assistance in sleeping.  (Tr. 758).  In a follow-up medicine check visit on March 20, 2008, Dr. Haiderzad discussed Claimant's medication regime.  (Tr. 757).  Although Claimant returned for a follow-up visit on August 6, 2008, the dictation would not be available for three weeks.  (Tr. 755-56).

On July 12, 2008, Claimant received treatment in the emergency room at Poplar Bluff Regional Medical Center for headaches.  (Tr. 812-17).  The emergency doctor noted he had made a referral to a pain clinic in one month.  (Tr. 818).  The doctor treated Claimant with Toradol and Norflex, and Claimant reported pain to be unchanged.  (Tr. 820).  The doctor gave additional medications, Dilaudid and Phenergan, and Claimant reported headache pain decreased.  (Tr. 820). The doctor noted his clinical impression to be acute severe migraine headache.  (Tr. 821).  The doctor noted that Claimant's condition at discharge to be improved.  (Tr. 823).

On July 31, 2008, Claimant returned to the emergency room complaining of headaches. (Tr. 825).  The MRI of Claimant's brain revealed essentially negative results.  (Tr. 827).   On August 18, 2008, Claimant returned complaining of vomiting and diarrhea.  (Tr. 828-43). Examination showed his neck to be supple or palpable adenopathy and his spine to be non-tender. (Tr. 844).  The doctor treated Claimant with medications and his symptoms improved.  (Tr. 844-45).

On August 30, 2008, Claimant returned to the Immediate Healthcare for medication refills.  (Tr. 51).  Claimant reported pain and bipolar disorder, and he received medications as

treatment. (Tr. 51). In follow-up September 28, 2008, Claimant requested refills of his Prilosec and his headache medications. (Tr. 50). The examining doctor noted Claimant to have a normal gait and stance. (Tr. 50). Claimant received follow-up treatment on October 11, 2008 for a sinus infection. (Tr. 49). Claimant reported having an increase in migraine headaches caused by his medications. (Tr. 49).

The electroencephalogram on September 8, 2008 revealed normal testing. (Tr. 826). The x-ray of Claimant's cervical spine showed degenerative joint disease most pronounced at C5-6 with anterior osteophytes and disc space narrowing. (Tr. 852). The x-ray of Claimant's lumbar spine was negative for acute osseous abnormality and revealed old transverse process fractures at L1and on the left at L5. (Tr. 853).

## IV.    The ALJ's Decision

The ALJ found that Claimant met the insured status requirements of the Social Security Act through June 30, 2008. (Tr. 28). The ALJ found that Claimant has not engaged in substantial gainful activity since November 2, 2003, the alleged onset date of disability. The ALJ found that the medical evidence establishes that Claimant has the following severe impairments: degenerative joint disease, of the cervical spine, migraines, bipolar disorder, and alcohol abuse, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found that Claimant's statements concerning his limitations not to be fully credible. The ALJ noted that under the special technique for evaluating mental impairments, 20 C.F.R. §§ 404.1520a and 416. 920a, Claimant's mental impairments do not satisfy the diagnostic criteria of Part A of a listing nor do his impairments meet the Part B criteria. In support, the ALJ cited how Claimant has slight limitations of activities

of daily living; moderate limitations of social functioning; and slight limitations of concentration, persistence, or pace. (Tr. 28). The ALJ further noted that Claimant has one or two episodes of decomposition each year, lasting for at least two weeks. (Tr. 29). Thus, the ALJ concluded that Claimant's mental impairments do not meet Part C criteria. The ALJ found that Claimant has the residual functional capacity to perform his past relevant work as a packager at a meat packaging plant and as an auto part pin striper as Claimant performed the work. The ALJ opined that Claimant has the maximum residual functional capacity to lift and carry fifty pounds occasionally and twenty-five pounds frequently. Further, Claimant can sit, stand, and walk for six hours. Claimant must avoid occupational hazards such as unprotected heights and dangerous, open, and moving machinery and work that requires interaction with the public. The ALJ found that Claimant was not under a disability from through the date of the decision. (Tr. 29).

## V.    Discussion

In a disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and

1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274

F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The claimant's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the claimant's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "if it is supported by substantial evidence on the record as a whole."

Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Wiese, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. Id. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ failed to properly evaluate his impairments. Claimant also contends that the ALJ failed to properly assess his credibility. Next, Claimant contends that the ALJ failed to properly formulate his RFC. Claimant also contends that the ALJ failed to properly determine whether he could perform his past relevant work.

A.    ALJ's Finding Claimant's Impairments Not Severe

Claimant argues that the ALJ erred in finding back pain, depression, and anxiety were non-severe impairments. The ALJ found that Claimant had the severe impairments of degenerative

joint disease of the cervical spine, migraines, bipolar disorder, and alcohol abuse. As noted above, Claimant is disabled if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months and which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinic and laboratory diagnostic techniques." Brown v. Shalala, 15 F.3d 97, 98 (8th Cir. 1994). An impairment or combination of impairments is severe if it "significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §404.1520(c). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). It is the claimant's burden to establish that an impairment is severe. Id.

A review of the record shows that the ALJ found Claimant's back impairment to be non-severe inasmuch as the diagnostic imaging revealed no significant abnormalities and numerous examinations showed normal results. As noted by the ALJ, Claimant often reported back pain to various doctors. The June 11, 2004 x-ray of Claimant's cervical spine showed mild reversal of curvature in the upper cervical spine and lumbosacral spine within normal limits. On August 2, 2007, Dr. Hahn noted how no diagnostic imaging had been completed in the last two to three years and ordered the following diagnostic images of his cervical spine, thoracic spine, and lumbar spine. The x-ray of Claimant's cervical spine showed degenerative changes of the cervical spine, but no evidence of acute traumatic abnormality. The x-ray of Claimant's thoracic spine showed no evidence of acute traumatic abnormality. The x-ray of Claimant's lumbar spine showed lumbosacral spine within normal limits. The ALJ noted how the September 8, 2008 x-ray showed

degenerative joint disease of the cervical spine and old transverse process fractures at L1 and L5. While an ALJ may not disregard subjective complaints solely because they are not fully supported by the medical evidence, the ALJ may discount such complaints if they are inconsistent with objective medical findings. Jones v. Astrue, 619 F.3d 963, 975 (8th Cir. 2010). In addition to the diagnostic findings, the ALJ noted that many of Claimant's examinations showed normal results including no tenderness in the lower lumbosacral area and treating doctors noted Claimant having a normal gait. In the August 2, 2007 treatment note, Dr. Hahn found that Claimant's range of motion to be fairly well preserved. Examination showed some generalized tenderness to palpation over the paraspinal musculature from the cervical spine to the lumbar spine with the tenderness most noticeable over the right cervical spine and lumbosacral region. During an examination on November 5, 2007, the doctor observed Claimant's gait to be normal and noted a full extremity strength. On February 4, 2008, Dr. Haiderzad observed Claimant's gait to be normal and his attention and concentration overall to be fair. These examination findings support the ALJ's determination that Claimant's back impairment to be not severe. Accordingly, the objective medical evidence on the record shows Claimant's back impairment to be non-severe.

Claimant next contends that the ALJ failed to properly evaluate his depression and anxiety. The ALJ considered Claimant's allegations of severe mental impairment and found Claimant to have the severe mental impairments of bipolar disorder and alcohol abuse. The ALJ's failure to find depression and anxiety to be severe impairments is harmless inasmuch as the ALJ continued his evaluation of Claimant's mental functioning at later steps of the sequential evaluation process. In rating the degree of functional limitations, the ALJ found that Claimant's mental impairments resulted in slight limitations of activities of daily living; moderate limitations

of social functioning; a slight limitation of concentration, persistence, or pace; and one or two episodes of decomposition.

The undersigned may reject the ALJ's decision only if it is not supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). Substantial evidence is that which "a reasonable mind might accept as adequate" to support the Commissioner's conclusion. Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993). The Court may not substitute its own judgment or findings of fact when reviewing the record for substantial evidence. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

B.      Credibility Determination

Claimant contends that the ALJ failed to properly assess his credibility.

The determination of Claimant's credibility is for the Commissioner, and not the Court, to decide. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). The ALJ may not discredit Claimant's complaints of pain solely because they are unsupported by objective medical evidence. O'Donnell v. Barnhart, 318 F.3d 811, 816 (8th Cir. 2003); Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Instead, the ALJ must fully consider all of the evidence relating to the subjective complaints, including the Claimant's work record, the absence of objective medical evidence to support the complaints, and third party observations including treating and examining doctors as to:

1.      claimant's daily activities;

2.      duration, frequency and intensity of the pain;

3.      precipitating and aggravating factors;

4.      dosage, effectiveness and side effects of medication;

5.      functional restrictions.

Ford v. Astrue, 518 F.3d 979, 982 (8th Cir. 2008) (citing Polaski v. Heckler, 739 F.2d 1320,

1322 (8th Cir. 1984)).  The ALJ may disbelieve the claimant's subjective complaints "if there are

inconsistencies in the evidence as a whole."  Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th

Cir. 2004).

When determining a claimant's complaints of pain, the ALJ may disbelieve such

complaints if there are inconsistencies in the evidence as a whole.  Polaski, 739 F.2d at 1322. The

ALJ must make express credibility determinations detailing the inconsistencies in the record that

support the discrediting of the claimant's subjective complaints.  Singh v. Apfel, 222 F.3d 448,

452 (8th Cir. 2000); see also Johnson v. Secretary of Health and Human Servs., 872 F.2d 810,

813 (8th Cir. 1989).  "An ALJ must do more than rely on the mere invocation of Polaski to insure

safe passage for his or her decision through the course of appellate review."  Harris v. Shalala, 45

F.3d 1190, 1193 (8th Cir. 1995).  Where an ALJ explicitly considers the Polaski factors but then

discredits a claimant's complaints for good reason, his decision should be upheld.  Browning v.

Sullivan, 958 F.2d 817, 821 (8th Cir. 1992).  However, the Eighth Circuit has held that an ALJ is

not required to discuss each Polaski factor methodically.  Brown v. Chater, 87 F.3d 963, 966 (8th

Cir. 1966).  The ALJ's analysis will be accepted as long as the opinion reflects acknowledgment

and consideration of the factors before discounting the claimant's subjective complaints.  Lowe v.

Apfel, 226 F.3d 969, 972 (8th Cir. 2000); see also Brown, 87 F.3d at 966.  The ALJ's credibility

findings are entitled to deference if the findings are supported by multiple valid reasons.  See Goff

v. Barnhart, 421 F.3d 785, 791-92 (8th Cir. 2005); Gregg v. Barnhart, 354 F.3d 710, 714 (8th

Cir. 2003) (if ALJ explicitly discredits claimant and gives good reasons for doing so, court will

normally defer to credibility determination).  Claimant's contention that in making his credibility

determination, the ALJ failed to give

weight to his testimony is with merit.  Nonetheless, the undersigned finds that the ALJ's

credibility determination is supported by substantial evidence, and thus the ALJ's alleged failure to

give specific consideration to this factor does not undermine his credibility determination being

supported by substantial evidence in the record as a whole.

In his decision the ALJ thoroughly discussed the observations of an agency interviewer,

his daily activities, low annual income, and the lack of medical evidence corroborating Claimant's

subjective complaints of functional limitations.  See Gray v. Apfel, 192 F.3d 799, 803-04 (8th Cir.

1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancy

between complaints and medical evidence, inconsistent statements, lack of pain medications, and

extensive daily activities).  The lack of objective medical basis to support Claimant's subjective

descriptions is an important factor the ALJ should consider when evaluating those complaints.

See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995) (lack of objective findings to support

pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022

(8th Cir. 1994) (the ALJ was entitled to find that the absence of an objective medical basis to

support claimant's subjective complaints was an important factor in evaluating the credibility of

her testimony and of her complaints).  The ALJ noted that although Claimant asserts that he is

unable to work due to neck and back pain , migraines, and bipolar disorder, the clinical and

objective medical findings are inconsistent with an individual experiencing totally debilitating

symptomatology.  The ALJ then addressed other inconsistencies in the record to support his

conclusion that Claimant's complaints were not credible.

In support, the ALJ considered the observations of an agency interviewer who observed that the claimant was neat and clean and indicated that Claimant had no problems understanding, concentrating, sitting, standing, and walking. The ALJ opined that these observations were somewhat inconsistent with Claimant's allegations.

Social Security Ruling 06-3p provides information on how the Commissioner should consider opinions from individuals, or sources, that are not "acceptable medical sources." Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007). The regulations separate sources into two categories: "acceptable medical sources," and "other sources." Id. "Other sources" are further divided into two sub-categories: "medical sources" and "non-medical sources." Id. Accordingly, the agency interviewer would be classified as a non-medical source, and the ALJ properly considered his observations in evaluating the credibility of Claimant's subjective complaints.

Claimant's activities of daily living were also inconsistent the limitations he alleged. Claimant maintained the household by cooking, cleaning, doing the dishes and laundry, and shopping. Claimant reported hunting and fishing as his leisure activities. He also played games on the Play Station and the computer for hours. See Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010) (acts that are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility). The ALJ found based on the objective medical record, Claimant's daily activities as a whole are not fully consistent with his allegations about the severity of his impairments and limitations. The ALJ opined that the inconsistencies between Claimant's subjective complaints and his ability to engage in many normal daily activities diminishes his credibility and provides evidence that he could work on a daily basis in the national economy. Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005) (citing Riggins v. Apfel, 177 F.3d 689, 692

(8th Cir. 1999); <u>see also</u> <u>Nguyen v. Chater</u>, 75 F.3d 429, 439-41 (8th Cir. 1996) (holding that a claimant's daily activities including visiting neighbors, cooking, doing laundry, and attending church, were incompatible with disabling pain).

The ALJ also considered Mr. Mott's testimony at the hearing and the letters from Claimant's mother and Chief Paul White Eagle. (Tr. 19). Although the ALJ found that their testimony supported Claimant's allegations, the undersigned finds that their testimony mirrored that of a Claimant, whose testimony was discredited for specific, explained reasons. <u>See</u> <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000) (ALJ did not err by not specifically discrediting testimony of claimant's husband because same evidence that supported adverse credibility assessment of claimant supported ALJ's disregard of husband's testimony); <u>accord</u> <u>Lorenzen v. Chater</u>, 71 F.3d 316, 319 (8th Cir. 1995). Inasmuch as the ALJ gave explicit reasons for discrediting Claimant's testimony, the undersigned finds that the ALJ's failure to discredit the testimony of Mr. Mott and Claimant's mother is not reversible error.

The ALJ noted that Claimant's "work history does not lend a great deal of credibility to the claimant in his allegations about his work-related limitations." (Tr. 19). <u>See</u> <u>Wildman v. Astrue</u>, 596 F3d, 959, 968-69 (8th Cir. 2010) (ALJ properly considered claimant's sporadic work history to her alleged onset date as detracting from her credibility). Claimant's weak earnings history prior to his alleged disability onset date was also a valid factor for the ALJ to consider in assessing Claimant's credibility. <u>See</u> <u>Fredrickson v. Barnhart</u>, 359 F.3d 972, 976-77 (8th Cir. 2004) (holding that the claimant was properly discredited due, in part, to her sporadic work record, reflecting low earnings and multiple years with no reported earnings, pointing to potential lack of motivation to work); <u>see also</u> <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1218 (8th Cir. 2001)

(a poor work history "may indicate a lack of motivation to work, rather than a lack of ability.").

As demonstrated above, a review of the ALJ's decision shows the ALJ not to have denied relief solely on the lack of objective medical evidence to support his finding that Claimant is not disabled. Instead, the ALJ considered all the evidence relating to Claimant's subjective complaints, including the various factors as required by Polaski, and determined Claimant's allegations not to be credible. Although the ALJ did not explicitly discuss each Polaski factor in making his credibility determination, a reading of the decision in its entirety shows the ALJ to have acknowledged and considered the factors before discounting Claimant's subjective complaints. See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). Inasmuch as the ALJ expressly considered Claimant's credibility and noted numerous inconsistencies in the record as a whole, and the ALJ's determination is supported by substantial evidence, such determination should not be disturbed by this Court. Id.; Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996). Because the ALJ gave multiple valid reasons for finding Claimant's subjective complaints not entirely credible, the undersigned defers to the ALJ's credibility findings. See Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (deference given to ALJ's credibility determination when it is supported by good reasons and substantial evidence); Guilliams v. Barnhart, 393 F.3d 798, 801(8th Cir. 2005).

The undersigned finds that the ALJ considered Claimant's subjective complaints on the basis of the entire record before him and set out the inconsistencies detracting from Claimant's credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ pointed out inconsistencies in the record that tended to militate against the Claimant's credibility. See

Guilliams, 393 F.3d at 801 (deference to ALJ's credibility determination is warranted if it is supported by good reasons and substantial evidence). Those included Claimant's daily activities, low annual income, and the lack of medical evidence corroborating Claimant's subjective complaints of functional limitations, and the observations of an agency interviewer. The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). Accordingly, the ALJ did not err in discrediting Claimant's subjective complaints. See Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001) (affirming the ALJ's decision that claimant's complaints of pain were not fully credible based on findings, inter alia, that claimant's treatment was not consistent with amount of pain described at hearing, that level of pain described by claimant varied among her medical records with different physicians, and that time between doctor's visits was not indicative of severe pain). The undersigned finds that substantial evidence supports the ALJ's finding the medical records do not support the extent of Claimant's subjective complaints of pain. See Flynn v. Astrue, 513 F.3d 788, 792 (8th Cir. 2008) (standard of review; substantial evidence is enough that reasonable mind might accept it as adequate to support decision).

The undersigned may reject the ALJ's decision only if it is not supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). Substantial evidence is that which "a reasonable mind might accept as adequate" to support the Commissioner's conclusion. Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993). The Court may not substitute its own judgment or findings of fact when reviewing the record for substantial evidence. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

C. <u>Residual Functional Capacity</u>

With regard to the ALJ's determination of Claimant's RFC, the undersigned finds that the ALJ properly assessed the medical evidence and Claimant's credibility. "The ALJ must determine a claimant's RFC based on all of the relevant evidence." <u>Fredrickson v. Barnhart</u>, 359 F.3d 972, 976 (8th Cir. 2004). It is the responsibility of the ALJ to assess a claimant's RFC based on all the evidence, including medical records, the opinions of treating and examining physicians, as well as the claimant's own statements regarding his limitations. <u>McGeorge v. Barnhart</u>, 321 F.3d 766, 768 (8th Cir. 2003); <u>McKinney v. Apfel</u>, 228 F.3d 860 863 (8th Cir. 2000) (citing <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995)). "In analyzing the evidence, it is necessary to draw meaningful inferences and allow reasonable conclusions about the individuals's strengths and weaknesses." SSR 85-16. SSR 85-16 further delineates that "consideration should be given to ... the [q]uality of daily activities ... [and the a]bility to sustain activities, interests, and relate to others *over a period of time*" and that the "frequency, appropriateness, and independence of the activities must also be considered." SSR 85-16.

An ALJ must begin his assessment of a claimant's RFC with an evaluation of the credibility of the claimant and assessing the claimant's credibility is primarily the ALJ's function. <u>See</u> <u>Anderson v. Barnhart</u>, 344 F.3d 809, 815 (8th Cir. 2003) (finding a claimant's credibility is primarily a matter for the ALJ to decide); <u>Pearsall</u>, 274 F.3d at 1218. In making a credibility determination, an ALJ may discount subjective complaints if they are inconsistent with the record as a whole. <u>Holstrom v. Massanari</u>, 270 F.3d 715, 721 (8th Cir. 2001) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."); <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984). In <u>Polaski</u>, the Eighth Circuit set out factors for

an ALJ to consider when determining the credibility of a claimant's subjective complaints. The ALJ must make express credibility determinations detailing the inconsistencies in the record that support the discrediting of the claimant's subjective complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). "An ALJ must do more than rely on the mere invocation of Polaski to insure safe passage for his or her decision through the course of appellate review." Harris v. Shalala, 45 F.3d 1190. 1193 (8th Cir. 1995). However, the Eighth Circuit has held that an ALJ is not required to discuss each Polaski factor methodically. The ALJ's analysis will be accepted as long as the opinion reflects acknowledgment and consideration of the factors before discounting the claimant's subjective complaints. Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000). See also Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). An ALJ is only required to consider impairments he finds credible and supported by substantial evidence in determining a claimant's RFC. See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) ("The ALJ properly limited his RFC determination to only the impairments and limitations he found to be credible based on his evaluations of the entire record.")

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863

(8th Cir. 2000)).  Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by some medical evidence.  See Lauer, 245 F.3d at 704.

After considering the medical evidence and Claimant's subjective complaints, the ALJ found Claimant to have the residual functional capacity to lift and carry fifty pounds occasionally and twenty-five pounds frequently.  Further, Claimant can sit, stand, and walk for six hours. Claimant must avoid occupational hazards such as unprotected heights and dangerous, open, and moving machinery and work that requires interaction with the public.  The ALJ further opined that Claimant cannot perform work that requires interaction with the public.

The ALJ's determination of Claimant's RFC is supported by substantial evidence in the record.  Likewise, the ALJ noted several inconsistencies within the record, and he pointed out the lack of supporting objective medical evidence.  Indeed, the ALJ highlighted the lack of documentation in the treatment records of restrictions upon Claimant's functional capacity ever placed on Claimant.  The ALJ specifically noted the medical evidence showed Claimant's cervical impairment would limit his ability to lift and carry but not restrict as much as Claimant alleged. The ALJ also noted that although there is evidence showing Claimant has difficulties interacting with the public, Claimant indicated that he could shop and attend tribal meetings.

The ALJ also properly considered the Polaski factors in concluding that Claimant's subjective complaints of pain and discomfort are not supported by the objective medical evidence inasmuch as Claimant failed to receive consistent treatment for his pain.  The ALJ listed facts from Claimant's hearing testimony regarding the Polaski factors and the medical record that reflected upon Claimant's ability to perform work.  Further, the ALJ pointed out other inconsistencies in

the record that tended to militate against Claimant's credibility.  See Samons v. Astrue, 497 F.3d 813, 818  (8th Cir. 2007) (finding that substantial evidence supported the ALJ's decision where there were too many inconsistencies in the case).  Those included Claimant's daily activities, low annual income, the lack of medical evidence corroborating Claimant's subjective complaints of functional limitations, and the observations of an agency interviewer.  Based on the ALJ's analysis of the medical evidence and Claimant's credibility, the undersigned finds that there exists in the record substantial evidence to support a finding that Claimant retains an RFC to perform work requiring lifting and carrying fifty pounds occasionally and twenty-five pounds frequently; sitting, standing, and walking for six hours.  The ALJ further found that Claimant must avoid occupational hazards such as unprotected heights and dangerous, open, and moving machinery and work that requires interaction with the public and cannot perform work that requires interaction with the public.  The ALJ's determination does not contradict any of the medical evidence, and nothing else in the record detracts from his decision.  Based on the ALJ's analysis of the medical evidence and Claimant's credibility, the undersigned finds that there exists in the record substantial evidence to support the ALJ's RFC finding.

Claimant's contention that the ALJ's RFC is deficient inasmuch the ALJ failed to a provide "the specific bridge between the RFC and the medical evidence as required by SSR 96-8p is without merit.  In the instant case, the ALJ summarized in detail the medical and nonmedical evidence, including Claimant's treatment notes indicating his affect and mood to be within normal limits, slight limitations of activities of daily living, low earning record, and followed written instructions if given clearly.  Although the ALJ did not present his RFC findings in bullet points with each limitation immediately followed by a discussion of the supporting evidence, such a rigid

format is not required by Social Security Ruling 96-8p. Rather, the concern fo Ruling 96-8p is "that failure to make the function-by-function assessment 'could result in the adjudicator overlooking some of an individual's limitations or restrictions.'" Depover v. Barnhart, 349 F.3d 563, 567 (8th Cir. 2003) (quoting Ruling 96-8p). The ALJ did not, however, overlook any of Claimant's limitations.

The substantial evidence on the record as a whole supports the ALJ's decision. Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

D.    Ability to Perform Past Work

Based on Claimant's description of how he performed his past relevant work as a packager at a meat packaging plant and an auto part pin striper, the ALJ found that Claimant was able to perform his past relevant work. Claimant contends that the ALJ erred by not making specific findings about the physical and mental demands of his past relevant work. See SS82-62, 1982 WL 31386 (1982) (holding that a decision that a claimant can perform past relevant work must include findings as to (1) the claimant's RFC; (2) the physical and mental demands of the

past work; and (3) whether the claimant's RFC would permit a return to the past work). "A conclusory determination that the claimant can perform past work, without these findings, does not constitute substantial evidence that the claimant is able to return to [her] past work." <u>Groeper v. Sullivan</u>, 932 F.2d 1234, 1239 (8th Cir. 1991).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). Additionally, '[a]n ALJ may find the claimant able to perform past relevant work if the claimant retains the ability to perform the functional requirements of the job as [] he actually performed it or as generally required by employers in the national economy." <u>Samons v. Astrue</u>, 497 F.3d 813, 821 (8th Cir. 2007). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. <u>Moore v. Astrue</u>, 572 F.3d 520, 523 (8th Cir. 2009).

The ALJ considered Claimant how Claimant performed work at a meat packing plant on the packaging floor for eight hours a day, five days a week. The ALJ found that this work was substantial gainful activity performed within fifteen years from the date of his decision such that it qualified as past relevant work. Claimant reported the heaviest weight he lifted to be fifty pounds and frequently lifted two pounds and the job did not require the use of machines, tools, or equipment or to interact with the public. The ALJ opined that Claimant's past work as a packager did not exceed the limitations set forth in his RFC, and thus Claimant could perform his past relevant work. Likewise, the ALJ considered Claimant's statements regarding his past work as an auto part pin striper. The ALJ found that Claimant performed this work ast the substantial gainful activity level within fifteen years form the date of his decision such that it qualified as past

relevant work.  Claimant reported the job requiring lifting of no more than five pounds and no interaction with the public or exposure to occupational hazards.  The ALJ opined that Claimant's past work as an auto part pin striper did not exceed the limitations set forth in his RFC, and thus Claimant could perform his past relevant work.

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision.  "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse if [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently."  Krogmeier v. Barnhart 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted); accord Gowell, 242 F.3d at 796.

Therefore, for all the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed and that Claimant's Complaint be dismissed with prejudice.

The parties are advised that they have fourteen  (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this   2nd   day of March, 2012.